**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **APEX TRADER FUNDING, INC.,** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | **Civil Action No. _______________** |
| | § | |
| **LEO RIOT, MARTIN MONTANO, and DAY TRADERS LLC,** | § | |
| | § | |
| | § | |
| ***Defendants.*** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Apex Trader Funding, Inc. ("**Apex**") files this Original Complaint (the "**Complaint**") against Defendants Leo Riot ("**Riot**"), Martin Montano ("**Montano**"), and Day Traders LLC ("**Day Traders**") (collectively, "**Defendants**").

## I. INTRODUCTION

This case arises from Defendants' breach of a Settlement Agreement that is less than two months old. The Settlement Agreement represents the Defendants' surrender after nearly two years of frivolous litigation launched by Defendants against Apex.[1] This prior litigation, in turn, followed a multi-year conspiracy by Riot and Montano to breach their contracts with Apex, defraud Apex, and sabotage Apex's business.

At the time they executed the Settlement Agreement, Defendants faced impending sanctions for their destruction of evidence, contempt of this Court's orders, and perjury. The Defendants also faced irrefutable evidence establishing Defendants' breaches of contract, fraud, and other misconduct. Moreover, Riot was set for a deposition that he and his counsel desperately

[1] The Settlement Agreement is attached as Exhibit 1.

needed to avoid because Riot would have no choice but to compound his perjury or admit to devastating facts.

To escape impending sanctions and established liability, Riot and the other Defendants surrendered. The terms of that surrender included **Riot paying $16,000,000 in damages for the reputational harm he caused to Apex and its executives** and Riot and Montano (and their affiliates) further admitted to breaching their contracts, posting false and deceptive videos for the purpose of damaging Apex's and its Executive's reputations, and engaging in frivolous and baseless litigation.[2]

Additionally, Defendants made a simple promise. They agreed to cease disparaging Apex and to remove Disparaging Statements[3] previously made. This included Defendants' commitment to withdraw Riot's false claims that Riot created, built, or was responsible for Apex's success; withdraw references touting Montano's tenure as an Apex "affiliate"—in fact a fraudulent scheme between Montano and Riot to steal millions from Apex; and to immediately scrub every direct and indirect reference to Apex from the Day Traders website and other websites and social media under Defendants' control.

Defendants further agreed that each time they violated these non-disparagement provisions, they would owe $1,000,000 in liquidated damages to Apex. And Defendants, represented by multiple sophisticated law firms, voluntarily waived all defenses to such damages.

Defendants breached the Settlement Agreement immediately. Defendants remain in breach of the Settlement Agreement as of this filing.

---

[2] The final judgment ending Defendants' litigation in before this Court is attached as Exhibit 2; the stipulated judgment ending the state case is attached as Exhibit 3 (the court has not yet entered judgment).
[3] Defined in the Settlement Agreement, Ex. 1 § XII.A-XII.B.

For example, on the day Defendants signed the agreement and every day since, the Day Traders Website has boasted that Day Traders "developed the technology powering some of the world's most successful funding companies," [*i.e.* Apex]; that Riot's software "powered $500M+ in revenue" [Apex's revenue]; and that its technology is "the backbone of top funding companies" [Apex]. The Day Traders website also advertised Montano as an "Affiliate Marketing Powerhouse" and the "#1 Top Affiliate" for "one of the largest futures funding firms in the world"—explicit references to Montano's and Riot's fraud against Apex, and statements that are expressly and specifically prohibited by the Settlement Agreement.

Defendants' disparagement did not end with the Day Traders' website. It extends to Defendants' social media accounts. For example, Riot's LinkedIn page boasts that he is the "creator and copyright owner of proprietary automation engines used across major futures funding platforms" [Apex]; Day Trader's social media continues to falsely credit Riot with Apex's success; and Riot continues to disparage Apex through his Wikipedia page, which on information and belief he authored and edits himself.

The Settlement Agreement prohibits Defendants from advancing the false and disparaging claims they made throughout their failed campaign against Apex; it prohibits Riot and Montano from advertising their fraud; it prohibits Defendants from claiming or implying that Apex's success was in any way theirs; and it obligates Defendants to remove Disparaging Statements from websites and social media under their control.[4] Defendants breached these promises. Apex brings this action to enforce the Settlement Agreement; to recover the $1,000,000 in agreed liquidated damages for each separate Disparaging Statement; to recover Apex's actual damages and attorneys' fees; and to obtain an injunction compelling Defendants to fulfil their obligations.

[4] Ex. 1 § XII.B.

## II. PARTIES

1. Plaintiff is a corporation organized under the laws of Texas, with a principal place of business in Austin, Texas. Apex may be served in this matter via its undersigned counsel of record.

2. Defendant Riot is an individual and a citizen of the State of Nevada. Riot may be served with process at 1625 Hinson St., Las Vegas, Nevada 89102.

3. Defendant Montano is an individual and a citizen of the State of Nevada. Montano may be served with process at 1625 Hinson St., Las Vegas, Nevada 89102.

4. Defendant Day Traders is a limited liability company organized under the laws of the State of Nevada, with a principal place of business in Las Vegas, Nevada. Day Traders may be served with process via its registered agent, MKNET LLC, at 1625 Hinson St., Las Vegas, Nevada 89102.

## III. JURISDICTION

5. The Court has jurisdiction over this lawsuit under 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different U.S. states and the amount in controversy exceeds $75,000, excluding interest and costs. Specifically, Plaintiff is a citizen of Texas and Defendants are citizens of Nevada.

6. Moreover, the parties are all signatories to the Settlement Agreement. In the Settlement Agreement, the parties each irrevocably consented to personal jurisdiction in this Court and agreed not to challenge jurisdiction. Ex. 1 at Art. XV.B.

## IV. VENUE

7. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

8. Further, in the Settlement Agreement, the parties agreed that "[a]ny action or proceeding arising out of or relating to this Agreement shall be brought exclusively in the United States District Court for the Western District of Texas or the state courts of Travis County, Texas." Ex. 1 at Art. XV.B. Each party additionally waived "any objection to the laying of venue in such court" and agreed not to challenge venue.

## V. FACTUAL BACKGROUND

### A. In 2021, Darrell Martin Founded Apex with his long-time business partner, John Skelton.

9. Apex is a Texas-based financial-technology company and leading futures funding evaluation firm. Apex's business model functions as follows: A prospective trader trains with Apex by trading futures in a simulated environment. If the trader demonstrates proficiency in the simulated environment, then Apex provides the trader with a performance account (still in a simulated environment). If the trader passes certain consistency metrics, Apex may allow the trader access to an Apex proprietary account using Apex's capital to trade on Apex's vendor-regulated trading platform. On the live platform, the trader retains 90% of any profits earned.

10. Darrell Martin founded Apex in 2021. Martin is Apex's founder and sole shareholder. With Apex, Martin's vision was to expand on the success of his prior training and education business, which operated as the Apex Investing Institute (**"Apex Investing"**). Martin built Apex Investing to provide education and training for customers looking to break into the futures trading industry.

11. Darrell Martin originally hired John Skelton to work at Apex Investing. While there, Martin and Skelton evaluated the options available for themselves and clients looking for a futures funding firm (also known as a "prop firm" in the industry). Both Martin and Skelton were

dissatisfied with the existing offerings and options. So they began to consider launching their own prop firm, designed by traders for traders. This was the genesis of Apex Trader Funding, Inc.

12. In 2021, Martin and Skelton decided that they would move forward with their plan. Martin founded Apex, and hired Skelton to provide marketing support, and later operational management of the company. Martin hired Skelton in these roles because of Skelton's decade of experience in the trading industry, business acumen, and tireless work ethic. Since joining the company, Skelton has been indispensable to the company's success. Together, Martin and Skelton built Apex into an industry leader.

### B. Apex contracted Riot as a work-for-hire programmer.

13. Also in 2021, Martin hired Riot to assist in developing the software that would enable the Apex platform to provide financial education, evaluation, and tools that its customers may use for trading a variety of financial instruments in simulated environments (and later, in live accounts).

14. Apex retained Riot's services under a contract called the Programming Agreement ("**Programming Agreement**"). The Programming Agreement gave Riot a 33% interest in Apex's net profits, while providing Apex sole and exclusive ownership of all intellectual (and other) property developed with Riot's assistance, developed by Riot, or used in connection with the Apex platform. More specifically, the Programming Agreement: (1) guaranteed Apex owned its platform, all copyrights, the source code, and all other intellectual property and confidential information associated with the platform created before and after the agreement's execution, (2) precluded Riot from using Apex's confidential information, (3) obligated Riot to store all source code and tools associated with the platform on Apex-owned servers, and (4) prohibited Riot or his spouse from participating in the Affiliate Program (defined and discussed in detail below).

**C. Riot engaged in a multi-year campaign to misappropriate Apex's trade secrets and confidential information and sabotage its platform.**

15. Beginning shortly after its founding, Apex enjoyed enormous success. It offered a platform unlike anything else in the market and grew at an exponential rate. This resulted in significant profits split between Martin, Skelton, and Riot according to the parties' contracts.

16. However, Riot was not satisfied with the massive windfall he obtained from Apex. Instead, Riot wanted to take everything and destroy Martin and Apex. To that end, Riot engaged in a campaign to misappropriate Apex's technology and trade secrets, breach his contract, and sabotage Apex's operations.

17. Riot began by taking exclusive and absolute control of Apex's technology and systems. Riot did so under the pretext of providing enhanced "security" to the Apex platform and took advantage of his past business relationship with Martin. At first, Martin trusted Riot and relied on Riot's false representations concerning his consolidation of power and removal of Apex's code and other property. Riot abused this confidence and trust to perpetuate his scheme.

18. Over a period of years, Riot abused his position within Apex to gain absolute and exclusive control over Apex's source code, database, website, corporate email, membership website, and platform (among other systems). On multiple occasions, Riot prevented any Apex employee, staff member, approved contractor, service representative, or company director from accessing any of this critical Apex property.

19. When Apex demanded the return of its property, Riot refused to move the Apex platform and code to servers under Apex's control, as required by the Programming Agreement. Instead, Riot falsely claimed ownership of Apex's property and held Apex's platforms and code hostage. Riot then began to make threats and demands.

20. Apex tried to negotiate with Riot for a time, in the interest of preserving the company and protecting its operations, employees, and customers. Riot's misconduct and erratic behavior escalated, however.

21. For example, in November 2023, Riot stated he, not Apex, owned the code and threated to "move [his] empire somewhere else" and establish a business. At that time, Riot had the power to follow through on this threat because he had improperly seized exclusive control over Apex's systems and property.

22. In a second example, also in November 2023, Riot sent an Apex employee a chat message, stating: "sure thing you might own the titanic on an LLC but if I am the captain you fucking do as a I say or everyone drowns. [sic] . . . I develop the technology and sometimes drastic stuff happens for the greater good. [sic] . . ." Days later, Riot explicitly threatened to "shut down" Apex's operations unless Apex fired a specific employee. Riot repeated this behavior on multiple occasions, concerning multiple Apex employees.

23. Throughout 2023 and 2024, Riot acted with increasing hostility toward Apex. In particular, Riot panicked in 2024, when he informed Apex that the IRS was auditing his trusts. Then, in June 2024, Riot sent Apex an ultimatum, demanding that Apex sign new contracts that would (1) transfer Apex's intellectual property to him, in direct contravention of the Programming Agreement; and (2) re-categorize millions of dollars in payments made by Apex to Riot and backdate the same.

24. If Apex refused, Riot threatened to withhold necessary maintenance and service, and to prevent Apex from performing that maintenance itself—effectively shutting down Apex and its platform.

25. When Apex rejected Riot's attempted extortion, Riot followed through on his threats. Specifically, Riot refused to perform basic and necessary maintenance on a known issue for thirteen hours. Riot's actions caused tens of thousands of accounts to stall, and customers lost access to those accounts. That single-day sabotage by Riot cost Apex **at least** $1 million.

26. During this shutdown, Riot ignored pleas by Apex personnel to restore the system. Riot also sent text messages to at least one Apex employee stating that he "will not move a finger" unless Apex signed the revised contract assigning him Apex's property. Riot then sent messages to Martin, repeating his demands for a new contract and refusing to address the shutdown until Martin signed that contract. Riot also continued to prevent access to Apex's systems by Apex personnel who could have restored those systems.

27. Riot eventually reinstated Apex's operations at a minimum level. But Riot ignored the influx of customer service requests arising from the thousands of customers who lost access to their accounts, lost the ability to sign up or reset their accounts, or could not place trades during the shutdown. Riot also prevented Apex from accessing the systems necessary to address those customer complaints. In the subsequent weeks, Riot repeated this behavior, simultaneously refusing to perform maintenance while preventing Apex from doing the same. Riot's sabotages cost Apex tens of millions of dollars.

28. The bottom line: Apex hired Riot to perform work-for-hire computer programming and paid him exceedingly well—Riot received tens of millions in distributions under the Programming Agreement. Apex and Riot reduced their agreement to a written contract, the Programming Agreement, at Riot's request. Both Riot and Apex executed that Programming Agreement.

29. But Riot was not content. He wanted to take everything for himself and destroy Martin and Apex. Riot therefore hijacked Apex's entire business, absconded with Apex's valuable intellectual property, including Apex's source code, and cut off Apex's access to its own platform, all in violation of the Programming Agreement and both state and federal law. Riot wrested control of Apex's infrastructure and used it as leverage during his attempt to extort Apex into ceding its intellectual property rights. When his plot failed, Riot neglected basic (but critical) maintenance while simultaneously preventing Apex from performing that maintenance. This caused a partial shutdown of Apex's business, costing Apex millions of dollars and compromising its relationships with its customers and vendors.

**D. Riot and Montano manipulated the Affiliate Program to defraud Apex.**

30. Riot's breaches of the Programming Agreement were not limited to his theft of Apex Property and sabotage of Apex's operations. Riot also engaged in a fraudulent scheme to siphon millions of dollars in affiliate marketing commissions to himself and his little cousin and co-conspirator, Defendant Martin Montano.

31. Riot implemented this fraudulent scheme by manipulating Apex's affiliate-marketing program (the "**Affiliate Program**"). Apex designed the Affiliate Program to incentivize its users as well as educators and influencers in the day trading industry to advertise Apex's products and recruit traders to the platform. Participants in the Affiliate Program are called "Affiliates." Affiliates receive unique links they can post on their affiliate sites, which include websites, social media, and other networks owned solely by the affiliates. The unique links refer prospective customers to Apex's website and products. Apex tracks the affiliates' unique links through internet cookies and, if the affiliates complied with their applicable agreements with Apex, they could earn commissions based on the sales generated by those who use their unique referral links.

32. Because breach of contract and trade secret misappropriation were not enough for Riot, he resorted to more insidious means in his failed campaign to ruin Apex. Namely, in the backdrop of Riot's abovementioned, apparent effort to destroy Apex, Riot posed as his former wife, Keslyn Riot, and partnered with his cousin, Montano, to improperly redirect customer traffic through Apex's Affiliate Program and, thereby, defraud Apex of millions in wrongfully paid affiliate commissions.

33. In the Programming Agreement, Riot specifically agreed that he would not participate in the Affiliate Program. Martin and Skelton likewise executed contracts prohibiting them from participating in the Affiliate Program. In other words, all three people with a profit-share in Apex—Martin, Skelton, and Riot—agreed that they would not double dip by also collecting affiliate commissions.

34. Martin and Skelton honored their commitments to the group and Apex. Riot did not.

35. Riot began breaching the Programming Agreement by fraudulently siphoning affiliate commissions almost immediately after signing the contract. Riot did so in two ways: (1) Riot set up Montano as a cut-out and proxy for Riot; and (2) Riot created false personas and aliases, which he then signed up as Apex affiliates. In both instances, Riot re-directed traffic to steal unearned affiliate commissions.

36. Apex first addresses Riot and Montano's conspiracy. Riot knew he was barred from the Apex affiliate program. Accordingly, he enlisted his cousin, Montano, to open an affiliate account in Montano's name. Riot and Montano then each concealed their relationship and Riot's association with that account. Montano was the face of the account while Riot worked behind the

scenes to orchestrate the fraudulent affiliate schemes and drive unearned revenue to Montano's account.

37. Specifically, Montano entered into an affiliate agreement with Apex around July 2022. Montano held the relevant affiliate account under his own name for approximately a year and a half, before assigning that account to Adnova, LLC in January 2024.

38. From 2022 to 2024 Montano and Riot used this scheme to siphon millions of dollars from Apex. In January 2023 alone, Montano's account reported over five thousand new transactions, generating over $37,000 in commissions from Apex. Over the months following, Montano's commission payments increased by hundreds of thousands. For example, in April 2024, Apex paid over $400,000 to Montano. By September 2024, Apex had paid Montano ***over $6.4 million*** in commissions associated with the affiliate account.

39. Unknown to Apex, Montano and Riot had agreed before opening the account that Montano would transfer 90% of the affiliate commissions collected by the Montano affiliate account to Riot. Montano retained 10% of the commissions in exchange for facilitating this fraud, misrepresenting himself as the face of the account, and concealing his connection with Riot.

40. Riot and Montano carried out this fraudulent affiliate scheme by: (1) intercepting customer traffic from non-affiliate accounts and recoding them with Montano's affiliate link or to links associated with aliases used by Riot, as discussed below, and (2) engaging in a widespread retargeting and/or remarketing campaign using Apex's Google Ads accounts. In other words, Riot and Montano effectively hijacked Apex's own Google advertising, and then funneled the revenue generated from Apex's Google Ads account through Montano, Adnova, and others.

41. Riot and Montano used Riot's insider access to Apex systems to improperly intercept customer traffic to Apex's website and code it to appear as though it has been referred

through Montano's affiliate link. By virtue of his role at Apex, Riot had the means and ability to make these changes to Apex's platform and did so without Apex's knowledge or permission.

42. Specifically, Riot intercepted customer traffic coming to Apex's website that either had no affiliate assignment or had been directed to Apex's website through Apex's paid Google advertising. Riot then altered code within Apex's system to assign the hijacked customer traffic to Montano's affiliate account. These acts made it appear as though the hijacked customer traffic was rightfully directed to Apex's website through Montano's affiliate link, entitling Montano to commissions on purchases made by those customers. In reality, the hijacked customers were not referred to Apex's website by Montano.

43. Riot and Montano further generated affiliate commissions through widespread remarketing or retargeting campaigns using Apex's website URL, which affiliates were not allowed to do.

44. Remarketing (or retargeting) is a marketing practice of showing follow-up ads to people who have visited a website but left without making a purchase. For example, when a prospective customer creates a shopping cart on a website but leaves without checking out, remarketing will follow that customer's internet activity and strategically display ads to them for the product that they previously abandoned. This practice exposes the customer to the product again and increases the likelihood of recapturing that customer and having them complete the sale.

45. One popular and powerful remarketing program is Google Ads. To get set up with Google Ads, a company creates a Google Ads account by registering its company website URL. Using this account, the company can promote its URL and company advertisements using Google Ads technology, which includes remarketing capabilities. The company's URL and ads are tagged with a Google tag that is linked to the company's Google Ads account. The Google tag tracks

visitors to the company URL and adds them to remarketing lists, enabling the company to target them later with ads based on their previous actions on the company's website. After a visitor leaves the company website, the tag will track the visitors and display Google remarketing ads to them while they continue to browse the internet.

46. Apex opened a Google Ads account that it used to promote its website, including through remarketing to prospective customers to redirect them back to Apex's website to complete a purchase. Riot had exclusive access to the Google Ads account at Apex.

47. Without Apex's consent, Riot took control of Apex's Google Ads account for his own benefit. Riot then gave Montano access to this Google Ads account for the purpose of posting Google Ads directing to Apex's URL. Riot also installed tracking codes on Apex's website and otherwise abused his access to Apex systems to redirect traffic to Montano's affiliate account.

48. Using Apex's Google Ads account, hijacked by Riot, Montano began remarketing to visitors of Apex's website. Riot and Montano installed Montano's affiliate link on the ads used in the remarketing campaign, ensuring Montano received credit and commissions for "referring" these customers to Apex.

49. Riot and Montano hid from Apex the true source of the customer traffic associated with Montano's affiliate links. Martin contacted both Riot and Montano about the extraordinary growth of referrals associated with the Montano affiliate account. Both Riot and Montano denied knowing each other or any person by their respective names. Again, Riot and Montano are cousins and business partners at Day Traders. Montano and Riot have known each other for Montano's (the younger cousin's) entire life.

50. Riot did not limit his affiliate-related fraud and breaches of the Programming Agreement to his conspiracy with Montano, however. Additionally, Riot created numerous aliases

and false personas, including "Daniel Bouchard" and "Amelie Bouchard." Riot then established Apex affiliate accounts under these aliases and directed additional affiliate commissions to himself.

51. Specifically, around January 2022, Riot created an affiliate account using the names Daniel Bouchard/Amelie Bouchard. Riot never disclosed to Apex that he, in fact, was posing as Daniel Bouchard or Amelie Bouchard, or that he was participating in the Affiliate Program under these or other aliases. On the contrary, when asked about the Bouchard aliases, Riot lied to Martin, stating that the Bouchard aliases were actual, real people. Riot blamed his then wife, Keslyn Riot, and other family members for referring the Bouchards to Apex.

52. From January to December 2022, Riot used the Bouchard aliases to defraud Apex and misappropriate more than $500,000 in affiliate commissions from Apex.

53. Then, in 2023, Apex's third-party payment processor for affiliate commissions, Deel, flagged pending payments requested by the Bouchard account for potential fraud. Among other things, Deel documented concerns regarding the actual identity of the person(s) representing themselves to be Daniel Bouchard. Deel then placed a hold on approximately $135,000 in payouts requested by the Bouchard account and reached out to whom they believed to be Daniel Bouchard to verify the identity of the payee (as required by law).

54. In response, Riot posed as Amelie Bouchard and, using an email alias, transmitted false statements to Deel in an attempt to secure release of the frozen funds. For example, Riot used Microsoft Photoshop to forge false Canadian identification documents for Amelie Bouchard, as well as falsifying photos of Amelie and Daniel Bouchard. Riot then transmitted these forged and falsified documents to Deel, attempting to convince Deel that Daniel and Amelie Bouchard were real people and that their payout requests were legitimate. At the same time, Riot used his position

at Apex to pressure Deel to complete the frozen payments under threats of escalating the issue or ceasing future business.

55. Even Riot's bank at the time, Capital One, froze one of Riot's bank accounts because he was receiving incoming deposits under false names and aliases. This included payments that Riot misappropriated from Apex using the Bouchard aliases, among others. Riot again submitted false statements to Capital One, trying to secure the proceeds of his fraud.

56. In sum, Riot used any means available to steal unearned commissions from Apex's affiliate program, including by partnering with his little cousin and assuming false identities to circumvent the Programming Agreement's prohibition on Riot's participation in the Affiliate Program.

**E. Riot extracted additional contracts from Apex through extortion and fraud and later sought the all-out destruction of Apex.**

57. As discussed, by May 2024, the forefront of the dispute was whether Riot could, by threats, force, or otherwise, convince Apex to restructure his deal under the Programming Agreement to alleviate his concerns about the IRS audit of his personal trusts. For example, on May 31, 2024, Riot sent draft contracts to Martin that contradicted the Programming Agreement in every way, including that Apex transfer full ownership of its code and other intellectual property to Riot and that the contract be backdated to mislead the IRS.

58. On June 4, 2024, Apex rejected Riot's demands, and he was furious, threatening legal action the very same day.

59. On June 5, 2024, one of Apex's systems went down, making trading impossible for roughly 50,000 Apex users. Riot—who had taken sole access to the systems for maintenance and repair in violation of the Programming Agreement—allowed the Apex system to remain offline. He then wrote to Apex staff and executives, stating, for example, that he "would not move a finger"

until Apex signed the draft contracts he proposed. As Riot put it in another text message to Martin: "no licensing contract, no help." On the same day, Riot sent Martin a letter purporting to terminate the Programming Agreement.

60. On June 6, 2024, Riot texted Skelton, praised Skelton for his good work in trying to broker a deal between Riot and Apex, and again threatened that he would not aid Apex if any part of the Apex platform went down—while still denying access to the systems to anyone else from Apex.

61. Despite Riot's sabotage and other erratic and disruptive behavior, Apex made every possible effort to resolve the parties' dispute and protect Apex's business and customers. To that end, Apex (through Skelton) engaged in negotiations with Riot. Throughout this process, Riot continued his erratic behavior, even threatening violence. Riot also continued to hold Apex's systems and code hostage throughout negotiations, threatening to cripple or destroy Apex's business unless his demands were met.

62. Notwithstanding that Apex conducted these negotiations with a metaphorical gun to its head, in July 2024, Apex finally closed a deal under which Riot would: (1) return Apex's code to its rightful owner, (2) cease any participation in Apex's business, and (3) stop any ongoing access to, or interference with, Apex's systems.

63. In exchange, Riot extracted a ransom in the form of two contracts: the Transition and License Agreements. Under these agreements, Riot retained his 33% interest in the distribution of Apex's net profits, and Apex agreed to: (1) pay compensation to Riot's trust (but not backdate the agreement), (2) end Riot's obligation to perform work for Apex, and (3) acknowledge Riot's ownership of a small, non-essential component of the software owned by Apex, called the "Automation Engine."

64. All Riot had to do to receive these benefits was return Apex's property and refrain from further sabotage. But he could not even manage that. Within days, Riot began breaching his obligations under the agreements and flaunting his noncompliance. For example, on August 1, 2024, Riot texted an Apex employee and confirmed he had no intention of honoring his commitment to returning Apex's code: "[t]hey [i.e., Apex] never saw the code so they don't know that half of it is missing. Hahahhahahhaha."

65. Riot also immediately violated the agreements by retaining copies of Apex's code, software, databases, client file, and other confidential information and later disclosed that information to Day Traders. In fact, Riot, Montano, and Day Traders built the Daytraders.com website and platform from copied Apex code, databases, and other confidential information. Riot also created Day Traders and facilitated the theft of Apex's property **<u>while still working with Apex</u>**. Montano is Day Traders' COO and proudly participated in Riot's failed attempt to kill Apex.

66. On October 28, 2024, Riot terminated his business relationship with Apex. At that point, Riot had no legal right to obtain or retain Apex's property or confidential information or access Apex's systems (he nonetheless did so, as discussed below). As of October 29, 2024, Apex operated completely independent of Riot—and he could not stand it.

67. Faced with this reality, Riot launched a campaign of hacking and sabotage, targeting Apex's systems and servers, that was enabled by his improper retention and misappropriation of Apex's property and confidential information. By way of example, on October 31, 2024, Riot illegally penetrated Apex's servers and systems by obtaining its login credentials to a German server used in connection with Apex Investing and its resources that Apex users rely upon for use in the Apex platform. Riot used his unauthorized access to log in to this server and

change the administrative credentials and login information from the Apex administrator credentials to his own personal e-mail address and password. This effectively locked Apex out of its own server. Riot then sent the German company that hosted the server a message to delete the server such that all Apex's data would be permanently deleted. Subsequently, Riot locked Apex out of a second Apex Investing server in a manner that effectively caused Apex Investing to shut down and affected Apex because the two platforms inter-operate.

68. After being notified of Riot's hacking, Apex's counsel immediately told Riot and his counsel to cease the ongoing misconduct and criminal activity. Riot ignored these requests and continued his campaign of miscreant behavior.

69. As another example, Apex discovered that Riot, while in his position at Apex, installed a monitoring software called "Hotjar" on Apex's systems that, after the end of his services, he used to illegally screen capture Apex's confidential information and maintain access to its systems. Riot then took these illegal screen captures and shared them with third parties and later published them on the Court's docket in a related lawsuit between the parties, as discussed below.

**F. Riot and Montano launched frivolous and baseless litigation against Apex.**

70. On December 11, 2024, Riot filed a baseless lawsuit against Apex in this Court. He withdrew the complaint before even serving Apex. On December 18, 2024, Riot refiled, demanding $19,000,000 in damages and alleging numerous baseless claims (Case No. 1:24-cv-01557-ADA (the "**Federal Case**")).

71. Also on December 11, 2024, at Riot's direction, Montano filed a state court action against Apex in Travis County, Texas, on December 11, 2024 (the "**State Case**"). *See Adnova, LLC, et al. v. Apex Trader Funding, Inc., et al.*, No. D-1-GN-24-009940 (250th Dist. Ct., Travis Cnty., Tex.).

72. Riot's and Montano's claims had no basis in law or fact. Both the Federal Case and State Case have been decided. This Court has entered final judgment against Riot and his conspirators on all claims, and in favor of Apex on its counterclaims for breach of contract against Riot and his affiliates. Ex. 2 (Final Judgment, Federal Case). Similarly, the parties have filed a stipulated final judgment ending the State Case. Ex. 3. In that stipulated judgment, Montano and Riot admit to standing-up Montano as a proxy for Riot, in violation of the Montano's Affiliate Agreement with Apex and the Programming Agreement executed by Riot. *Id.* at 1-3. The joint motion for entry of that judgment is pending before the Travis County District Court.

73. Rather, Riot used baseless litigation as a weapon. Riot deployed the Federal Case and State Case to generate false—but public—allegations designed to damage Apex's reputation and cover Riot's campaign of theft, sabotage, and extortion.

74. Over the next several months, Riot amended his complaint in the Federal Case multiple times, adding baseless claims for breach of contract, trade-secret misappropriation, false advertising, unfair competition, unjust enrichment, and conspiracy. With each amendment, the allegations grew more fantastical and less tethered to reality.

75. Riot's campaign of frivolous and baseless litigation failed. The Federal Case produced damning evidence against Riot. Apex was forced to file three motions for contempt and sanctions based on Riot's spoliation, perjury, and violations of the Court's orders. The Court appointed a special master to oversee the resulting discovery disputes and issue a decision on Riot's spoliation. A few highlights include (1) Riot's destruction of entire source-code repositories to cover up his misappropriation of Apex's property and copying of Apex's source code, including in violation of a TRO prohibiting the destruction of evidence that Riot himself requested; and (2) Riot continued destructions and concealment of evidence even after the Court appointed an

independent forensic examiner to examine Riot's devices and determine the scope of his spoliation.

76. As the depth of Riot's misconduct became undeniable, his own attorneys began fleeing. Both Lloyd & Mousilli and Quinn Emanuel Urquhart & Sullivan, LLP withdrew as Riot's counsel after actively prosecuting Riot's frivolous claims for months. Riot replaced these firms with Barlit Beck LLP. To avoid sanctions, Bartlit Beck promptly withdrew Riot's second amended complaint under the safe harbor provisions of Federal Rule of Civil Procedure 11(c)(2).

77. Throughout 2025, Apex developed the record devastating Riot's claims and establishing Riot, Montano, Day Traders, and their affiliates' liability on Apex's counterclaims. For example, and without limitation, Apex deposed Leo Riot (four times), deposed Martin Montano (three times), and deposed other executives and representatives of Day Traders. Apex also subpoenaed and received documents from third parties, including Deel, revealing the depth of Riot, Montano, and Day Trader's misconduct.

### G. Riot, Montano, and Day Traders admit defeat, and the Parties execute the Settlement Agreement.

78. The Federal and State Cases concluded in August 2026, with Riot, Montano, Day Traders (among others) stipulating to final judgment in Apex's favor (Ex. 2, Ex. 3) and issuing public statements retracting the frivolous allegations they had made in those cases (Ex. 4).

79. These judgments were the product of discussions that began on August 4, 2026, the day before Riot was set to testify by deposition in the State Case. Additionally, the parties were days away from a hearing set by the special master appointed in the Federal Case to resolve Apex's motions for contempt and sanctions.

80. This left Riot and his co-conspirators facing difficult choices. Riot would either have to: (1) admit the extent of his and Montano's fraud and other misconduct, including without

limitation by confirming his use of the Bouchard aliases, transmission of falsified documents to financial institutions, multiple instances of perjury, and acts of spoliation; or (2) lie under oath, again, in demonstrable and verifiable ways.

81. Riot chose to avoid the issue by finally admitting the truth: his claims were baseless; his attempts to destroy Apex were failures; and he stood in breach of his contracts.

82. Riot and his co-conspirators, including Montano and Day Traders, confirmed these facts through the execution of the Settlement Agreement on August 14, 2026 (Ex. 1). The Settlement Agreement resolved both the Federal and State Cases.[5] Riot executed the Settlement Agreement on behalf of himself, Day Traders, and several trust entities. Montano executed the agreement on behalf of himself and his several trusts.

83. As discussed above, the Settlement Agreement is a surrender. In it, Riot, Montano, and Day Traders stipulated to facts and admissions that gutted every claim they had ever asserted against Apex.

84. ***First***, Defendants stipulated that their claims were meritless. The Settlement Agreement provides:

> **WHEREAS**, The Riot Parties and the Montano Parties stipulate, acknowledge, and agree that the claims they asserted against the Apex Parties in the Federal Case and the State Case are without merit, that the Apex Parties are not liable for any such claims, and that Riot and Montano are liable for breach of contract as set forth in the stipulated judgments to be entered in those cases (attached hereto as Exhibits 1 and 2);

Ex. 1 at 1.

85. ***Second***, Defendants stipulated to their own liability. Section III establishes:

[5] The Settlement Agreement also included trust entities and other affiliates of Riot and Montano. Riot and Day Traders (among others) are collectively referenced in the Settlement Agreement as the "**Riot Parties.**" Montano and Adnova are the "**Montano Parties**." Ex. 1 at 3 (Art. I.H and I.J).

> **B. Stipulation of Liability for Breach of Contract by Riot.** The Riot Parties and the Montano Parties hereby stipulate and agree that they are liable for breach of contract as set forth in the stipulated judgments described in Section VII of this Agreement judgments and attached as Exhibits 1 and 2, as well as the stipulated public statement to be issued by the Riot Parties and Montano Parties, attached as Exhibit 3.

*Id.* § III.B. They also waived all rights to appeal. *See id.* § 3.C.

86. ***Third***, **<u>Riot agreed to pay Apex $16,000,000</u>**:

> **A. Payment Amount.** Riot (or QST on his behalf) shall pay to Apex the Settlement Payment in immediately available funds via wire transfer to an account designated by Apex in Section II(E) below in two installments:
>
> 1. Within three (3) business days of the Effective Date, a first installment in the amount of twelve million dollars ($12,000,000.00) (the "First Installment");
>
> 2. Within three (3) business days of the completion of the CRA certification described in Section VIII(F) below, or within ten (10) days of the Effective Date, whichever occurs first, a second installment in the amount of four million dollars ($4,000,000.00) (the "Second Installment").

*Id.* § II.A.

87. The parties allocated the Settlement Payment in equal thirds, reflecting the parties' agreement and acknowledgement that Riot, Montano, and Day Traders' frivolous claims had done severe damage to the reputations of Apex, Martin, and Skelton.

> **B. Allocation.** The Parties stipulate that the Settlement Payment shall be allocated by Apex as follows:
>
> 1. One-third of the Settlement Payment (*i.e.*, $5,333,333.34) in resolution of claims asserted against or by Apex, and as damages for the reputational harm to Apex;
>
> 2. One-third of the Settlement Payment (*i.e.*, $5,333,333.33) in resolution of claims asserted against Darrell Martin, and as damages for the reputational harm to Darrell Martin;
>
> 3. One-third of the Settlement Payment (*i.e.*, $5,333,333.33) in resolution of claims asserted against John Skelton, and as damages for the reputational harm to John Skelton.

*Id.* § II.B. In other words, Riot paid $16 million to compensate for the very reputational harm he now seeks to inflict again, as discussed below.

88. ***Fourth***, Riot was required to transfer the domain "atf.com"—the same domain he had hijacked years earlier—to Apex, "free and clear of all liens and encumbrances." *Id.* § II.C.

89. ***Fifth***, Defendants acknowledged Apex's ownership of its intellectual property in unequivocal terms. The Settlement Agreement confirms:

> A. **Apex Ownership.** Apex owns all rights, title, and interest in and to all technologies, software, code, systems, platforms, trade secrets, and other intellectual property that Apex has used in the past or is currently using in connection with its business, including without limitation any modifications, enhancements, or derivative works thereof (collectively, the "**Apex Technology**"). The Riot Parties and Montano Parties recognize and admit, on behalf of themselves and their respective affiliates, that, as between the Parties, Apex owns all right, title and interest in the Apex Technology, including without limitation all "add ons," plugins, software, code, and all other intellectual and other property designated as owned by Apex in the Programming Agreement.

*Id.* § VI.A. And Riot agreed never to "challenge, contest, or take any action inconsistent with Apex's ownership of the Apex Technology." *Id.* § VI.C.

90. ***Sixth***, Defendants agreed to the supervised destruction of all "Apex Information" in their possession. *Id.* § VIII.D.

91. ***Seventh***, the Settlement Agreement imposed perpetual confidentiality obligations. Defendants agreed to "hold in strict confidence any and all Apex Information" in their possession, "in perpetuity and forever." *Id.* § XI.B. Any breach of this obligation triggers significant monetary consequences—$1 million per disclosure:

> D. **Confidentiality Liquidated Damages.** The Parties acknowledge and agree that a breach of the confidentiality obligations set forth in this Section would cause irreparable harm to Apex that would be difficult to quantify. Accordingly, in the event of any breach of this Section by Riot or Montano as determined by a court of competent jurisdiction, the breaching Party shall pay to Apex "Confidentiality Liquidated Damages" in the amount of One Million Dollars ($1,000,000.00), with each separate disclosure constituting a separate occurrence and separate incident of breach subject to liquidated damages. The Riot Parties and Montano Parties

*Id.*

92. ***Eighth and particularly relevant to this case***, the Settlement Agreement also imposed a sweeping, perpetual non-disparagement obligation on Defendants:

> **A. Non-Disparagement Obligation.** In perpetuity and forever, the Riot Parties and the Montano Parties (and each of their respective affiliates, agents, representatives, employees, and persons acting in concert with them) agree not to make, publish, communicate, or cause to be made, published, or communicated — whether orally or in writing, whether publicly or privately, whether directly or indirectly, and whether to any person, entity, media outlet, social media platform, governmental authority, or otherwise — any statement that is disparaging, defamatory, negative, critical, or harmful to the reputation or business interests of Apex, Darrell Martin, John Skelton, or any other person or entity affiliated with the Apex Parties (a "Disparaging Statement").
>
> For purposes of this Agreement, a "Disparaging Statement" includes, without limitation, any statement that a reasonable person would consider negative, critical, unflattering, or damaging to reputation, regardless of whether such statement is true or false. The Apex Parties shall have no corresponding non-disparagement obligation and shall retain full freedom to make any statement whatsoever regarding Riot, Montano, or any other person or entity.

*Id.* § XII.A.

93. The non-disparagement provision includes specific prohibitions. Riot agreed he would not claim to be an "owner," "founder," "partner," or "creator" of Apex, nor the "mastermind" or "inventor" behind Apex's success. *Id.* § XII.B. Riot "acknowledge[d] and concede[d] that Riot was a contractor for Apex, and the applicable contracts are now terminated." *Id.* Defendants agreed they would not allege that Apex, Martin, or Skelton engaged in any "misconduct, misrepresentation, 'fraud,' 'swindling,' or any similar term." *Id.* They agreed they would not allege that Apex "'fraudulently' or improperly denied any payout" to any customer. *Id.*

94. Like the non-disclosure provisions, a breach of the non-disparagement provisions mandate that Defendants pay liquidated damages of $1 million per violation:

> **C. Liquidated Damages.** In the event of any breach of the non-disparagement obligations set forth in this Section by the Riot Parties or Montano Parties as determined by a court of competent jurisdiction, the breaching Party shall pay to Apex liquidated damages in the amount of One Million Dollars ($1,000,000.00) ***per incident of breach***. The Parties agree that this amount represents a reasonable estimate of the damages that would be suffered by Apex and is not a penalty.

*Id.* § XII.C.

95. Defendants specifically stipulated that the Disparagement Liquidated Damages provisions were necessary, waived any defenses to such damages, and stipulated to the necessity of equitable relief:

> **D. Disparagement Liquidated Damages.** The Parties acknowledge and agree that a breach of the non-disparagement obligations set forth in this Section would cause irreparable harm to the Apex that would be difficult to quantify. Accordingly, in the event of any breach of this Section by the Riot Parties or the Montano Parties as determined by a court of competent jurisdiction, the breaching Party shall pay to Apex "Disparagement Liquidated Damages" in the amount of One Million Dollars ($1,000,000.00), with each separate disclosure constituting a separate occurrence and separate incident of breach subject to liquidated damages. The Riot Parties and the Montano Parties acknowledge that establishing actual damages would be impracticable or extremely difficult to ascertain and therefore agree that the provision for Disparagement Liquidated Damages hereunder does not constitute a penalty. The Riot Parties and the Montano Parties acknowledge that these Disparagement Liquidated Damages have been specifically negotiated and are, among other things, to compensate Apex for the reputational damages for the Riot Parties' or the Montano Parties' breach(es) of this Section and for Apex's costs and expenses associated with such breach(es) and enforcement of remedies in light of such breach(es). The Riot Parties and the Montano Parties hereby waive any rights and/or benefits of any law, rule, regulation, or order now or hereafter existing that could serve as a basis against payment of the agreed Disparagement Liquidated Damages set forth herein, whether because the same would constitute a penalty or otherwise. The Disparagement Liquidated Damages set forth in this Section are in addition to, and not in lieu of, any and all other rights and remedies available to the Apex Parties at law or in equity, including the right to seek and obtain specific performance, temporary, preliminary, and permanent injunctive relief, and other equitable relief. The Riot Parties and the Montano Parties further acknowledge and agree that any breach or threatened breach of this Section will cause the Apex Parties immediate, substantial, and irreparable harm for which monetary damages alone (including the Disparagement Liquidated Damages as set forth herein) would be an inadequate remedy, and accordingly the Apex Parties shall be entitled to seek and obtain such injunctive and equitable relief in any court of competent jurisdiction without the necessity of posting any bond or other security and without proof of actual damages. The Riot Parties and the Montano Parties waive any defense or objection based on adequacy of remedy at law or any requirement to post a bond.

*Id.* § XII.D.

96. On August 20, 2026, the federal court entered the Final Judgment contemplated in the Settlement Agreement. *See* Ex. 2. The Final Judgment memorializes Riot's total defeat. The Court found that "Plaintiffs' claims against Apex are without merit, and that Apex is entitled to judgment in its favor on all such claims." *Id.* ¶ 22. The Court also found that "all allegations asserted in this case concerning Apex's supposed 'fraud' or 'swindling' of any customers, affiliates, or any other persons are without merit or basis in fact." *Id.* ¶ 23. Thus, the Court entered judgment in favor of Apex on its counterclaims for breach of the Programming Agreement, the Transition Agreement, and the License Agreement. *Id.* at 7. Apex was declared a "prevailing part[y] in this action." *Id.* at 8.

97. The Final Judgment also confirms that Riot asserted frivolous and baseless claims in his second amended complaint but invoked the Rule 11 safe harbor and withdrew those claims to avoid sanctions.

> 19. On September 14, 2025, Apex served Plaintiffs with a motion for sanctions under Rule 11 of the Federal Rules of Civil Procedure. Thereafter, Plaintiffs invoked the safe-harbor provisions of Rule 11(c)(2) agreed to withdraw certain claims and allegations, including without limitation Riot's claims for trade secret misappropriation and all allegations concerning Apex's supposed "fraud" against its customers or affiliates. ECF 241.

*Id.* ¶ 19.

98. Riot and Montano, individually and on behalf of their affiliates, including Day Traders, also executed a Public Statement conceding defeat. Amont other things, Riot, Montano, and Day Traders admitted as follows:

> I wish to correct certain issues raised in publicly filed documents in those cases and through a social media personality, Kelly Ann Marlin (also known as Trades by Kelly Ann). Accordingly I, Leo Riot, publicly state as follows:
>
> **1.** Apex and its executives, employees, and affiliates (including all named defendants in both the Federal Case and the State Case (collectively, the "Cases"), and any associated trusts or affiliates of any named defendant) are not liable on any state or federal claims asserted by me, Martin Montano, or any of our respective companies, entities, or affiliates. I understand judgment will soon be entered in the Cases in favor of Apex and the defendants on all claims that I have asserted, and against me and the other plaintiffs for breach of contract. I have agreed that such judgments are correct and appropriate.

Ex. 4 at 1.

99. Riot, Montano, Day Traders, and their affiliates further admitted that:

(a) Apex did not "defraud" me [Riot]; (ii) Apex did not breach any contract with me or any entity I control; (iii) Apex did not misappropriate any intellectual (or other) property from me or any company or entity I control; and (iv) Apex owns all rights to all technologies it has used in the past and is using now.

(b) "I [Riot] and entities under my control breached the contracts I executed with Apex. This includes the Programming Agreement I executed in 2022, and the Transition and License Agreements that I executed in 2024."

(c) "To further correct the record, I admit that Apex, Martin, and Skelton did not engage in any 'fraud,' 'rug pulls,' or otherwise defraud Apex's customers. To my knowledge, all payout denials by Apex were not

> fraudulent. All allegations I made in the Federal Case concerning any such fraud by Apex, Martin, or Skelton **are not true**."

*Id.* at 1–2 (emphasis added).

100. The admissions do not stop there. Riot also confessed to fabricating the very evidence that powered his media campaign, admitting that he "edited a video of an Apex business meeting involving Skelton and others at Apex," that the "edited video included only two minutes of that meeting, spliced together," and that he "sent the edited video to Kelly Ann Marlin to publish **for the purpose of casting Apex and Skelton in a false, negative light**." *Id.* at 2 (emphasis added). He admitted: "The edited video was not accurate." *Id.*

101. Montano's Public Statement was equally damning. Montano admitted he "filed the State Case . . . at the direction of Leo Riot." *Id.* at 5. He admitted that "Apex, the other named defendants, and their affiliates are not liable for any claims asserted by me or Adnova, LLC" and that "[a]ny allegation that I made that Apex breached any contract with me or Adnova, or otherwise failed in any obligation to me or Adnova, is not true." *Id.* He further admitted that he and Adnova "breached the Affiliate Agreements" with Apex. *Id.*

102. The Settlement Agreement, the Agreed Judgment, and the public statements speak for themselves. Riot admitted he fabricated evidence. He admitted that every allegation of fraud he leveled against Apex, Martin, and Skelton was untrue. He admitted he breached every contract he signed with Apex. He admitted his claims were meritless. **And he paid $16 million to make it all go away**.

## H. Defendants breached the Settlement Agreement within *hours* of signing.

103. The Settlement Agreement, specifically the non-disparagement provisions of Article XII, required Defendants to immediately remove "all references to Apex, including direct references or indirect references (e.g., to 'a top prop firm') from all websites and social media

under Riot's control (e.g., the Day Traders website, LinkedIn, Facebook, Instagram)." Ex. 1 § XII.B.1.

104. In direct breach of the obligations imposed by Settlement Agreement § XII.B.1, Riot continues to advertise Apex's revenue as his own and claim credit for Apex's success through the Day Traders website.

105. For example, the "Our Mission" section of the Day Traders website claims Day Traders "developed the technology powering some of the world's most successful funding companies." Further, the same page claims: "$500M+ revenue powered by our tech." But Day Traders only launched in February 2025 and never powered any third-party firm's revenue. Rather, these are indirect references to Apex and, again, improperly credit Riot and Day Traders with Apex's success.




Available at https://daytraders.com/about (last accessed Oct. 5, 2026) (emphasis added); *see also* Ex. 5 (compilation of screenshots).

106. Riot's biography page contains additional Disparaging Statements and therefore breaches the Settlement Agreement. For example: "Leo codes groundbreaking trading platforms as Day Traders CTO. His software powered $500M+ in revenue . . ."




Available at https://daytraders.com/about (last accessed Oct. 5, 2026) (emphasis added); *see also* Ex. 5.

107. In a separate page, Riot again has been coding since 1998 and powered $500M in revenue:



Available at https://daytraders.com/leo-riot (last accessed Oct. 5, 2026); *see also* Ex. 5. These statements likewise credit Riot with Apex's technology and success.

108. Similarly, the Day Traders website's "Why Day Traders" section states: "Trusted by industry leaders, our technology is the backbone of top funding companies."




Available at https://daytraders.com/ (last accessed Oct. 5, 2026); *see also* Ex. 5. "Top funding companies" is an indirect reference to Apex, functionally identical to the "a top prop firm" example the Settlement Agreement expressly identified as a prohibited reference to Apex.

109. The Day Traders website's "Services We Offer" section states: "We create funding software for day trading with risk management and platform integration" and "Since 2002, aMember powers high-traffic sites with 300k+ users, 100k+ daily."




Available at https://daytraders.com/services (last accessed Oct. 5, 2026); *see also* Ex. 5. These statements about an aMember-based funding software and "300k+ users" are direct references to Apex and its proprietary technology, prohibited by the Settlement Agreement.

110. Like Riot, Montano pledged that he and his affiliates "shall not make any statement or claim that Montano and Adnova (or any affiliate) is or was an Affiliate of Apex or in any way involved in the marketing of Apex's products or services." *Id.* § XII.B.2. This includes, without limitation, "Montano's immediate removal of all references to Apex, including direct references or indirect references (e.g., to 'a top prop firm') from all websites and social media under Montano's control (e.g., the Day Traders website, LinkedIn, Facebook, Instagram)." *Id.* And to avoid any doubt, the Settlement Agreement specifically provided that Montano or his affiliates, including Day Traders, would "make no reference to Apex and no reference to Montano or Adnova's activities prior to October 2024"—*i.e.*, Montano and Adnova's fraudulent participation in Apex's Affiliate Program.

111. Yet, as of September 29, 2026, the Day Traders website still features the following biographical post for Montano:




Available at https://daytraders.com/martin-montano (last accessed Oct. 2, 2026); *see also* Ex. 5. The "Affiliate Marketing Powerhouse" reference specifically refers to Montano's fraud against Apex, as does the "#1 Top Affiliate" moniker.

112. Additionally, as of at least September 3, 2026, the Day Traders website still broadcast the following, beneath the photo and remarks above.




Ex. 5.[6]

[6] At some point in September 2026, Defendants removed the mentions of Apex under the caption "Yachts, Luxury and Scale" from the Day Traders website. This removal does not cure Defendants' breach. And as discussed, Day Traders' website continues to contain prohibited references to Riot and Montano's abuse of the affiliate program.

113. The "digital marketing company focused in on the trading industry" in this advertisement is Adnova, LLC. Adnova's one function was to perpetuate fraud against Apex on behalf of Montano and Riot. Adnova and Day Trader's boast that "his [Montano's] company quickly became the top affiliate for one of the largest funding firms in the world" is a direct reference to Apex and Montano's and Adnova's activities before October 2024.

114. In other words, the Settlement Agreement prohibited Riot, Montano, and Day Traders from advertising through any reference to Apex, direct or indirect. The Settlement Agreement gave the example of the phrase "a top prop firm" as a demonstration of the indirect reference specifically prohibited by the non-disparagement provisions in Article XII, and the Settlement Agreement specifically prohibited Montano or Day Traders from advertising by reference to Montano, Riot, and Adnova's fraudulent abuse of Apex's affiliate program. Nevertheless, Montano and Day Traders continued to advertise using the specifically prohibited language.

115. Specifically. Montano claimed to have been an affiliate of Apex—the very relationship the Settlement Agreement forbade him from referencing. He described his activities prior to October 2024 in detail—his affiliate campaigns, his marketing company, his scaling of advertising—all in direct violation of the prohibition on references to pre-October 2024 activities. He held himself out as responsible for the success of the "largest futures funding firm in the world"—a statement the Settlement Agreement expressly prohibited. He did all of this on the Day Traders' website, the exact platform the Settlement Agreement identified as subject to the immediate-removal obligation.

116. Sections XII.B.1 through XII.B.6 of the Settlement Agreement specifically define prohibited statements that Riot, Montano, and Day Traders cannot assert and must remove from

websites or social media under their control. "This includes, without limitation, Riot's [and Montano's] immediate removal of all references to Apex, including direct references or indirect references." *Id.* §§ XII.B.1, XII.B.2. Section XII.B.7 of the Settlement Agreement further provides that "[a]ny statement in violation of any provisions above, shall be a 'Disparaging Statement' and breach of this Agreement." And Section XII.B.8 provides that "the Riot Parties and Montano Parties (and their affiliates) shall not make any statements or comments concerning the Apex Parties that are, or could be perceived, in any way as disparaging."

117. The Day Traders website content described above includes direct and indirect references to Apex and other Disparaging Statements specifically prohibited by the Settlement Agreement. By posting and failing to remove such content, Defendants are each in breach of the Settlement Agreement.

118. The Defendants' breaches of the Settlement Agreement are not limited to the disparagement and false advertising described above. Riot and Day Traders also used Day Traders' social media platforms and other online sources to engage in additional disparagement prohibited by the Settlement Agreement.

119. Specifically, on August 24, 2026 (ten days after executing the Settlement Agreement), Riot and Day Traders posted the following link to the Day Trader's X (formerly Twitter) and YouTube accounts.

𝕏 ← **Post**

**Day Traders**
@DayTraders_com

🔥 MX CO FOR OUR SPANISH-SPEAKING TRADING COMMUNITY! CL AR 🔥

Looking for an honest, in-depth look at DayTraders.com?

Gabriel Parra, a trusted trading content creator with a strong following across Latin America, just dropped a comprehensive 40-minute breakdown covering our accounts, platform features, and overall trading experience.

Not a Spanish speaker?

No worries! You can easily follow along in English by enabling auto-generated subtitles directly in the YouTube video settings.

🔗 Watch the full review here: youtube.com/watch?v=odNli3...

#PropFirm #LATAM #GabrielParra #FundedTrader #FuturesTrading #DayTrading #TradingEducation #DayTraders #DayTradersCom #TradingCommunity



Available at https://x.com/DayTraders_com/status/2091939202942558582?s=20 (last accessed October 5, 2026); *see also* Ex. 5; https://www.youtube.com/watch?v=odNli3EgWYw (last accessed October 5, 2026).

120. In the linked YouTube video, a paid Day Traders affiliate, Gabriel Para, specifically describes Riot as the founder of Day Traders "with a profile focused on technology" who has been "programming since the late 90s," working to develop technology for "very large futures prop firms. This exchange, copied below in part, represents another attempt by Riot and Day Traders to claim credit for Apex's technology and success—delivered with a wink and nod, by a paid Day Traders affiliate in blatant breach of the Settlement Agreement.




AÑO DE FUNDACIÓN
2024
UBICACIÓN
EEUU
EQUIPO DIRECTIVO
• MARTIN MONTANO: COFUNDADOR Y COO DE DAYTRADERS, CON EXPERIENCIA EN TRADING, MARKETING DIGITAL Y DESARROLLO DE NEGOCIOS.
• LEO RIOT: FUNDADOR Y CTO DE DAYTRADERS, CON UN PERFIL ENFOCADO EN TECNOLOGÍA Y DESARROLLO DE SOFTWARE, PROGRAMANDO DESDE FINALES DE LOS 90. HA TRABAJADO EN INFRAESTRUCTURA TECNOLÓGICA PARA PROP FIRMS DE FUTUROS.
MERCADOS SOPORTADOS
CME, CBOT, NYMEX Y COMEX.
BRÓKERS
• RITHMIC
• LIVE ACCOUNTS: EDGECLEAR / BROKER & DORMAN / FCM (FUTURES COMMISSION MERCHANT).
PLATAFORMAS
ARCTRADER, ONYX, QUANTOWER, VOLFIX, BOOKMAP, SIERRA CHART, MOTIVEWAVE.
SERVICIO AL CLIENTE
CHAT DE LA PÁGINA 24/7 Y DISCORD - MUY BUENO
REFERENCIAS
TRUSTPILOT 473 - 4.6
REPUTACIÓN
MUY BUENA
RESTRICCIÓN PAÍSES
know if I should, it’s not that I
can’t, but
AVISO IMPORTANTE: Esta información es so
dación. No garantizamos la legitimidad, continuidad ni seguridad de ninguna empresa o marca mencionada.
No tenemos relación con ellas y no nos hacen
daños o perjuicios derivados de su uso. Verifica siempre con la empresa antes de tomar cualquier decisión.


INTRODUCCIÓN Y GENERALIDADES
DAYTRADERS
GABRIEL PARRA
AÑO DE FUNDACIÓN
2024
UBICACIÓN
EEUU
EQUIPO DIRECTIVO
• MARTIN MONTANO: COFUNDADOR Y COO DE DAYTRADERS, CON EXPERIENCIA EN TRADING, MARKETING DIGITAL Y DESARROLLO DE NEGOCIOS.
• LEO RIOT: FUNDADOR Y CTO DE DAYTRADERS, CON UN PERFIL ENFOCADO EN TECNOLOGÍA Y DESARROLLO DE SOFTWARE, PROGRAMANDO DESDE FINALES DE LOS 90. HA TRABAJADO EN INFRAESTRUCTURA TECNOLÓGICA PARA PROP FIRMS DE FUTUROS.
MERCADOS SOPORTADOS
CME, CBOT, NYMEX Y COMEX.
BRÓKERS
• RITHMIC
• LIVE ACCOUNTS: EDGECLEAR / BROKER & DORMAN / FCM (FUTURES COMMISSION MERCHANT).
PLATAFORMAS
ARCTRADER, ONYX, QUANTOWER, VOLFIX, BOOKMAP, SIERRA CHART, MOTIVEWAVE.
SERVICIO AL CLIENTE
CHAT DE LA PÁGINA 24/7 Y DISCORD - MUY BUENO
REFERENCIAS
TRUSTPILOT 473 - 4.6
REPUTACIÓN
RESTRICCIÓN PAÍSES
CUBA, NICARAGUA, VENEZUELA, ETC.
can’t, but maybe I shouldn’t
disclose







121. Defendants and their affiliates continued to publish statements that directly or indirectly referenced Apex and (inaccurately) credited Riot with Apex's success on the Day Traders website, Riot's personal LinkedIn page, and a Wikipedia page. Those statements are direct violations of § XII.B.1 of the Settlement Agreement, which prohibits Riot from claiming he was the "owner," "founder," "partner," or "creator" of Apex, the "mastermind" or "inventor" behind

Apex, or otherwise responsible for Apex's success, and required immediate removal of all direct and indirect references to Apex—including via veiled references to "a top prop firm"—from websites and social media under Riot's control.

122. Riot's LinkedIn page currently contains **numerous** statements in violation of the Settlement Agreement, including: "In 2023, I launched my second funding company, fully automated end to end"; "I have designed platforms handling millions in volume, built proprietary automation engines for trader funding, risk enforcement, and payouts, and led teams that scaled affiliate operations to nine figures"; and "I am also the creator and copyright owner of proprietary automation engines used across major futures funding platforms."

**Leo Riot** · 3rd

Founder and Chief Technology Officer at DayTraders.com

Las Vegas, Nevada, United States · Contact info

500+ connections

\+ Follow | Connect | More

DayTraders.com

**About**

I wrote my first line of code in 1998.

I started in the Windows 95 era, breaking and rebuilding systems to understand how they really worked. In the early 2000s, I was programming on IRC, building eggdrop bots, scripting IRCd servers, and running Linux systems with custom firewalls and automation scripts.

By 2004, I was deep into PHP and MySQL, creating forum platforms and custom plugins.
In 2007, I built VB.NET software for large scale affiliate and online marketing systems.
In 2012, I moved into cryptocurrency, developing arbitrage engines and automated trading logic.
In 2014, I designed high speed futures trading software focused on execution, risk, and latency.
In 2023, I launched my second funding company, fully automated end to end.

I am the Founder and Chief Technology Officer of DayTraders.com.

My philosophy is simple. Automate everything. Eliminate friction. Build systems that scale cleanly under pressure.

I design and engineer trading technology that is fast, secure, and precise. Systems where performance and risk control are first class citizens, not afterthoughts.

Core expertise:
Algorithmic and high speed trading platforms
Futures market infrastructure and risk modeling
Enterprise PHP, C#, and VB.NET systems
FIX protocol and low latency architectures
Compliance driven automation and controls

I build more than software. I architect full ecosystems. I have designed platforms handling millions in volume, built proprietary automation engines for trader funding, risk enforcement, and payouts, and led teams that scaled affiliate operations to nine figures.

My work lives at the intersection of code, finance, and systems design. Precision matters. Discipline matters. Details matter.

I am also the creator and copyright owner of proprietary automation engines used across major futures funding platforms.

Available at https://www.linkedin.com/in/leoriot/?isSelfProfile=false (last visited Oct. 5, 2026) (emphasis added); *see also* Ex. 5.

123. Riot's reference to "platforms handling millions in volume" and "proprietary automation engines for trader funding, risk enforcement, and payouts" are direct references to

Apex and Riot falsely claiming ownership over Apex's technology and success. Riot's reference to "affiliate operations to nine figures" refers to Apex and Riot's and Montano's schemes to defraud Apex and manipulate its affiliate program. Riot's claim to be the "creator and copyright owner of proprietary automation engines used across major futures funding platforms" is another false claim to credit for the technology and success for Apex. Each of these is a Disparaging Statement under § XII.B.1 of the Settlement Agreement.

124. On Discord, Riot has failed to remove Disparaging Statements he has posted specifically referring to Apex and claiming credit for Apex's success. For example, Riot posted the following as he filed his frivolous lawsuits against Apex.




*See* Ex. 5.

125. In another example, Riot responded to comparisons of Day Traders and Apex, again claiming credit for Apex's technology and success.




*Id*.

126. Finally, Riot lards his own Wikipedia page with false references and Disparaging Statements about Apex.[7]


Technology and entrepreneurship [ edit ]

Riot doing a Flatspin while vert skating

Outside of skating, Riot is a software engineer and entrepreneur. He began programming in 1998 and was instrumental in developing the software licensed by one of the largest futures funding companies, contributing to over half a billion dollars in revenue within three years.[3] He currently serves as CTO of Day Traders, where he oversees technological innovation, software architecture, and operational efficiency.[3]

Available at https://en.wikipedia.org/wiki/Leo_Riot (last accessed October 5, 2026); *see also* Ex. 5.

## VI. CAUSE OF ACTION

### COUNT I: BREACH OF CONTRACT (SETTLEMENT AGREEMENT)

127. Apex incorporates the allegations contained in all preceding paragraphs as if fully set forth herein.

[7] On information and belief, Riot edits his own Wikipedia page or directs others to do so on his behalf.

128. The Settlement Agreement is a valid and enforceable agreement between Apex, Riot, Montano, and Day Traders (among other parties).

129. Among other obligations, the Settlement Agreement prohibits Defendants from making any Disparaging Statement concerning Apex, Martin, or Skelton. Ex. 1, Article XII.

130. The Settlement Agreement further defines Disparaging Statements and provides specific, illustrative examples of prohibited statements. *Id.* §§ XII.A, XII.B.1-XI.B.6. These examples include prohibitions barring Riot or any of his affiliates from claiming to be (or to have been) the "owner," "founder," "partner," or "creator" of Apex; barring Riot and his affiliates from claiming that he was the "mastermind" or "inventor" behind Apex or that he is responsible for Apex's success (or any similar statement). *Id.* § XII.B.1.

131. Other prohibited statements include any claim that Montano or Adnova was or is an Apex Affiliate, that Montano marketed Apex's products or services, or that Montano was responsible for any success achieved by Apex. *Id.* § XIIB.2. In fact, Montano agreed that he and his affiliates "will make no reference to Apex and no reference to Montano or Adnova's activities prior to October 2024." *Id.*

132. The Settlement Agreement further required Defendants to immediately remove all direct and indirect references to Apex and all Disparaging statements from "from all websites and social media under Riot's [or Montano's] control (*e.g.*, the Day Traders website, LinkedIn, Facebook, Instagram)." *Id.* §§ XII.B.1–2.

133. Apex has performed all its duties and obligations under the Settlement Agreement.

134. Defendants, on the other hand, immediately breached their obligations under the Settlement Agreement as follows:

(a) **Breach of § XII.B.1 by Riot and Day Traders by publishing Disparaging Statements on the Day Traders website.** Riot is the founder and CTO of Day Traders. The Day Traders website is under his control. Yet on the day the parties executed the Settlement Agreement, the Day Traders website contained multiple Disparaging Statements as defined in the Settlement Agreement. As of this filing, the Day Trader's website remains littered with direct and indirect references to Apex and other prohibited attempts by Riot and Day Traders to claim ownership of Apex's technology or responsibility for Apex's success, and other Disparaging Statements described in detail above.

(b) **Breach of § XII.B.2 by Montano and Day Traders by publishing Disparaging Statements on the Day Traders website.** The Day Traders website also is littered with Disparaging Statements pertaining specifically to Montano and his efforts, with Riot, to defraud Apex by manipulating Apex's affiliate program. These included statements describing Montano as an "Affiliate Marketing Powerhouse," the "#1 Top Affiliate" and "the top affiliate for one of the largest futures funding firms in the world," as well as claiming that "Martin also founded a digital marketing company [Adnova]" that "quickly became the top affiliate for one of the largest futures funding firms in the world [Apex]." *See* Ex. 5. All of these references remain on the Day Traders website as of the day of this filing. Each represents a separate and independent breach of the Settlement Agreement by Montano and Day Traders.

(c) **Breach of § XII.B.1 (Riot and Day Traders), by publishing additional Disparaging Statements.** Additionally, Riot and Day Traders used Riot's

LinkedIn and the Day Traders X (formerly twitter) account and YouTube page to publish statements that refer to Apex, directly or indirectly, and credit Riot with Apex's technology and success. These include statements that Riot is the "creator and copyright owner of proprietary automation engines used across major futures funding platforms." They also include statements that Day Traders "developed the technology powering some of the world's most successful funding companies," that Riot's software "powered $500M+ in revenue," and that Day Traders' technology is "the backbone of top funding companies," and the YouTube video described above crediting Riot with Apex's success. Each statement is the kind of "creator" or "responsible for Apex's success" claim, and the kind of indirect reference to "a top prop firm," that § XII.B.1 expressly prohibits. Riot and Day Traders also failed to remove those statements from websites and social media under Riot's control following execution of the Settlement Agreement.

(d) **Breach of §§ XII.B.7 and XII.B.8 (All Defendants).** Each statement identified above is a Disparaging Statement and a separate breach by each Defendant.

135. As a direct and proximate result of Defendants' breaches of the Settlement Agreement, Apex has suffered and will suffer damages and has been forced to incur attorneys' fees and costs. Apex seeks recovery of all damages, fees, and costs herein.

136. Additionally, each Disparaging Statement by Riot, Montano, and Day Traders is subject to the Liquidated Damages provisions of the Settlement Agreement. *Id.* §§ XII.C, XII.D. Each Disparaging Statement subjects the breaching party to liquidated damages of "One Million Dollars ($1,000,000.00), with each separate disclosure constituting a separate occurrence and separate incident of breach." *Id.* § XII.D. Defendants made multiple Disparaging Statements that

trigger this provision, including those described in the preceding paragraphs. Each is a separate incident of breach, and each triggers $1,000,000.00 in liquidated damages owed to Apex.

137. Additionally, the Defendants stipulated and agreed that $1,000,000 per incidence of breach represents "a reasonable estimate of the damages that would be suffered by Apex" and that such a sum is "not a penalty." *Id.* § XII.C. The Defendants further stipulated that:

(a) The breach of their non-disparagement obligations "would cause irreparable harm to Apex."

(b) The "Disparagement Liquidated Damages have been specifically negotiated and are, among other things, to compensate Apex for the reputational damages for the Riot Parties' or the Montano Parties' breach(es) of this Section and for Apex's costs and expenses associated with such breach(es) and enforcement of remedies in light of such breach(es)."

(c) The Defendants "hereby waive any rights and/or benefits of any law, rule, regulation, or order now or hereafter existing that could serve as a basis against payment of the agreed Disparagement Liquidated Damages set forth herein, whether because the same would constitute a penalty or otherwise."

(d) "The Disparagement Liquidated Damages set forth in this Section are in addition to, and not in lieu of, any and all other rights and remedies available to the Apex Parties at law or in equity, including the right to seek and obtain specific performance, temporary, preliminary, and permanent injunctive relief, and other equitable relief."

(e) Defendants "further acknowledge and agree that any breach or threatened breach of this Section will cause the Apex Parties immediate, substantial, and irreparable

harm for which monetary damages alone (including the Disparagement Liquidated Damages as set forth herein) would be an inadequate remedy, and accordingly the Apex Parties shall be entitled to seek and obtain such injunctive and equitable relief in any court of competent jurisdiction without the necessity of posting any bond or other security and without proof of actual damages."

(f) Defendants "waive any defense or objection based on adequacy of remedy at law or any requirement to post a bond."

*Id.* § XII.D.

## VII. ATTORNEYS' FEES

138. As a result of Defendants' breach, Apex retained attorneys and seeks reimbursement for its reasonable attorneys' fees, as authorized by Texas Civil Practices and Remedies Code Chapter 38 and Article XVI of the Settlement Agreement, which provides:

> **XVI. ATTORNEYS' FEES & EXPENSES FOR BREACH BY THE RIOT PARTIES OR THE MONTANO PARTIES**
>
> In the event of a material breach of this Agreement by the Riot or Montano Parties, Apex or the Apex Parties, should they prevail as determined by a court of competent jurisdiction, shall be entitled to recover their attorneys' fees and expenses incurred in connection with prosecuting a claim or action for the breach, or otherwise enforcing its rights against the breaching party. For the avoidance of doubt, this provision is not reciprocal, but rather drafted for the benefit of the Apex Parties only.

*Id.* at 20.

## VIII. REQUEST FOR PRELIMINARY INJUNCTION AND SPECIFIC PERFORMANCE

139. As more fully set out in Apex's separately filed application for a temporary injunction enjoining Defendants and their affiliates, agents, and all persons acting in concert with them from making, publishing, or causing to be published any Disparaging Statement, including any claim that Riot is or was an owner, founder, partner, creator, mastermind, or inventor of Apex

or responsible for its success (or any similar statement), or that Montano is or was an Apex Affiliate (or any similar statement), without the necessity of posting a bond, as Defendants agreed in § XII.D of the Settlement Agreement.

## IX. REQUEST FOR JURY TRIAL

140. Plaintiff demands a trial by jury on all issues.

## X. PRAYER

141. For these reasons, Plaintiff Apex Trader Funding, Inc. respectfully requests that Defendants be cited to appear and answer, and that, on final trial or other disposition, the Court enter judgment in favor of Apex and against Defendants Leo Riot, Martin Montano, and Day Traders LLC, jointly and severally to the extent permitted by law, awarding the following relief:

(a) Disparagement Liquidated Damages under §§ XII.C and XII.D of the Settlement Agreement of $1,000,000.00 for each separate Disparaging Statement, with each separate statement and publication constituting a separate incident of breach;

(b) Actual, consequential, and incidental damages proven at trial, to the extent not duplicative of liquidated damages, including reputational harm (in addition to liquidated damages as permitted by § XII.D of the Settlement Agreement, which provides they are "in addition to, and not in lieu of" other remedies);

(c) A preliminary and permanent injunction (i) enjoining Defendants and their affiliates, agents, and all persons acting in concert with them from making, publishing, or causing to be published any Disparaging Statement, including any claim that Riot is or was an owner, founder, partner, creator, mastermind, or inventor of Apex or responsible for its success, or that Montano or Adnova is or was an Apex Affiliate, without the necessity of posting a bond, as Defendants agreed in § XII.D of the Settlement Agreement; and (ii) ordering Defendants to immediately remove all direct and indirect references to Apex, and all references to Montano's or Adnova's activities before October 2024, from the Day Traders website, Riot's and Montano's LinkedIn pages, and all other websites and social media under their control, including the statements identified in this Complaint;

(d) Reasonable and necessary attorneys' fees and expenses under § XVI of the Settlement Agreement and Texas Civil Practice and Remedies Code Chapter 38, including conditional appellate fees;

(e) Pre-judgment and post-judgment interest at the maximum rate permitted by law;

(f) All costs of court; and

(g) Such other and further relief, at law or in equity, to which Apex may show itself justly entitled.

Dated: October 6, 2026.

Respectfully Submitted,

**VARTABEDIAN KATZ HESTER & HAYNES LLP**

*/s/ Travis E. DeArman*
Travis E. DeArman (SBN 24074117)
travis.dearman@vkhh.com
Gary Cruciani (SBN 05177300)
gary.cruciani@vkhh.com
Maria A. Garrett (SBN 24099673)
maria.garrett@vkhh.com
Tyler Freeman (SBN 24131316)
tyler.freeman@vkhh.com
2200 Ross Avenue, Suite 5000
Dallas, TX 75201
Telephone: (469) 654-1340

**MORRIS LAW GROUP**

Robert W. Morris (*pro hac* forthcoming)
rmorris@morris-lawgroup.com
35 Longvue Avenue
New Rochelle, NY 10804
Telephone: (914)-216-1398

***Attorneys for Plaintiff Apex Trader Funding, Inc.***